UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JASON BANAS, ) | |
|     Plaintiff, ) | |
| ) | No. 1:17-cv-306 |
| -v- ) | |
| ) | HONORABLE PAUL L. MALONEY |
| MICHAEL HAGBOM, ) | |
|     Defendant. ) | |
| ) | |

## OPINION

This matter is before the Court on Defendant Michael Hagbom's motion for summary judgment on Plaintiff's action under 42 U.S.C. § 1983. Because a material dispute of fact precludes summary judgment on some aspects of Plaintiff's excessive force claims, the motion will be granted in part and denied in part.

### I. Facts & Procedural Posture

Plaintiff Jason Banas supports the Michigan State Spartans football team. On August 29, 2014, he attended a Michigan State football game in East Lansing, Michigan after drinking earlier in the day. After the Spartans' decisive victory, Jason and some friends kept the festivities going at a friend's home. A few hours later, Banas decided to walk home because there was a lengthy wait for a taxi.

After trekking about two miles, Banas was stopped by Meridian Township Police Officer Michigan Hagbom. Officer Hagbom claimed to have seen Banas fall down. According to Plaintiff, he had merely dropped his phone. The exchange that followed was captured on audio and video by Officer Hagbom's dash camera within his police cruiser, although the initial portion was captured only via audio:

1

Officer Hagbom engaged Banas: "Yo! Police. Where you going, man?" Banas replied that he was going home, so Hagbom followed up, "Well, where's home, 'cause you're super drunk—you just fell down." Hagbom continued, suggesting that he could at least make sure Banas was going in the right direction. The next moments of the exchange are unintelligible, but Hagbom assured Banas that he was "not trying to mess with him" and that he'd only stopped because he saw Banas fall down.

Eventually, Hagbom coaxed a name from Banas: "Jason." Hagbom repeated that he was not there "to mess with" Jason. Hagbom then asked how much Banas had to drink and suggested that Banas sit down. Then, Hagbom informed Banas that since he "had contact" with him, he would have to give him a PBT—portable breath test—to make sure he was "not way too high."

Hagbom again assured Banas that he "was not in trouble" and that he just needed to take the breath test to make sure it was safe for him to continue walking home. Banas' response was slurred. Hagbom made the terms clear: blow less than a .30 and continue home or blow more than a .30 and go to the hospital. On the first attempt, Hagbom coached Banas: "Blow, Blow, Blow." However, Banas was apparently unsuccessful as Hagbom remarked, "Ah, you've got to try a little harder than that, man." The second attempt also failed to register. After the second attempt, Hagbom told Banas that he'd get one more try. Banas confusedly replied, with some slurring, "What are we doing?" With that, Hagbom abandoned the PBT and instructed that he would do a manual test.

Banas' tone grew frustrated, and he became uncooperative. He repeatedly asserted that he was "just walking home." Hagbom offered again to drive Banas home, but Banas rejected the offer saying that he "wanted nothing to do with" Officer Hagbom.

Banas then began to walk away—appearing in view of the camera for the first time. Officer Hagbom quickly followed Banas and instructed him to stop. Officer Hagbom reached Banas and grabbed his arm. Banas immediately began to pull away to continue to walk away from the scene, but Hagbom instructed him to stop or "he'd take him to the ground."

Officer Hagbom then declared that, in his assessment, Banas was a danger to himself, and so he asked if he needed to call an ambulance to check Banas out. This time, Banas agreed to be checked out by the paramedics, and it seemed for a moment that the situation was defused.

However, Officer Hagbom then attempted to guide Banas back towards the squad car to await the paramedics, but Banas wanted to remain where he was. Banas visibly resisted Hagbom's attempts to steer him back to the vehicle and gradually crouched to further resist Hagbom's efforts. Then, somewhat suddenly, Hagbom forcefully took Banas to the ground, and the pair tumbled to the edge of the frame. Once again, the exchange that follows is captured only by audio.

During the melee, Banas repeatedly asked "why are you fighting me?" while Hagbom instructed Banas to put his hands behind his back. During this time, Banas alleges that Hagbom used his knee to strike him three times in the ribs.

After approximately fifteen seconds, Hagbom became more verbally-distressed, commanding Banas to stop resisting. He warned Banas that "you're about to get tased" for allegedly continuing to resist. A second warning followed eleven seconds later. A few seconds after the second warning, Officer Hagbom deployed his taser for a single, ten second charge.[1]

Banas came away from the encounter with a broken rib, and he also claims to have suffered a traumatic brain injury during the fracas. And approximately four-and-a-half hours after the confrontation, Banas was administered a breath test and registered a .11 blood-alcohol concentration.

Banas was charged with a misdemeanor for violating Meridian Charter Township Ordinance § 50-141, which provides that "it shall be unlawful for any person to knowingly or recklessly obstruct, resist, hinder, or oppose any member of the Police Department or any police officer while on duty." A few months later, he was convicted by a jury. However, the circuit court overturned the conviction because of a faulty jury instruction.

Banas was then retried and again convicted. Once again, the circuit court overturned the conviction, this time finding that Office Hagbom had violated the Fourth Amendment in light of the duration of the stop, so Banas' resistance to his arrest was lawful. However, the Michigan Court of Appeals reversed the circuit court and reinstated Plaintiff's conviction, holding that "the record evidence supported the conclusion that Officer Hagbom's detention of defendant was lawful, and therefore defendant's resistance was not justified or permissible under Michigan law." *People v. Banas*, No. 338298 (Mich. Ct. App. Feb. 22, 2018) (available

---

[1] Banas and Hagbom have differing recollections as to precisely what happened after they hit the ground. The Court will further discuss their respective versions of the events when analyzing Plaintiff's claim for excessive force.

at ECF No. 37-2). Banas filed an application with the Michigan Supreme Court, which was denied by the court on September 12, 2018. (ECF No. 53-1.)

Plaintiff filed this civil suit under 42 U.S.C. § 1983, alleging that Officer Hagbom had violated his right to be free from false arrest and excessive force in violation of the Fourth Amendment. The matter is now before the Court on Defendant Michael Hagbom's motion for summary judgment.

## II. Legal Framework

### A. Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see, e.g., Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008).

The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the non-moving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once the moving party has carried its burden, the non-moving party must set forth specific facts, supported by record evidence, showing a genuine issue for trial exists. Fed. R. Civ. P. 56(e).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*,

5

398 U.S. 144, 158–59 (1970)). The question, then, is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that [the moving] party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252; *see, e.g., Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson,* 477 U.S. at 249) (noting the function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

### B. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is a legal question for the Court to resolve. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway*, 501 U.S. 510, 516 (1994)). When resolving an officer's assertion of qualified immunity, the court determines (1) whether the facts the plaintiff has alleged or shown establishes the violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (citing *Pearson v. Callahan* 555 U.S. 223, 232 (2009)). Courts may examine the two prongs in any order, depending on the facts and circumstances of each case. *Id.* at 567-68.

Once the qualified immunity defense is raised, the plaintiff bears the burden of demonstrating both that the challenged conduct violates a constitutional or statutory right and that the right was so clearly established at the time that "'every reasonable official would

have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether a law is clearly established, ordinarily this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) ("When determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals."); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Ordinarily, the right must be clearly established in a particularized sense, and not in a general or abstract sense, *id.* at 640—"[t]his standard requires the courts to examine the asserted right at a relatively high level of specificity and on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997).

However, on the other hand, the Sixth Circuit recently affirmed that "reading the[] cases together, the Supreme Court has made clear that the *sine qua non* of the 'clearly

7

established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015). Thus, "[w]hile it is apparent that courts should not define clearly established law at a high level of generality, it is equally apparent that this does not mean that 'a case directly on point' is required"; the question is, again, whether "precedent [has] placed the statutory or constitutional question beyond debate." *Id.* (citing *al-Kidd*, 563 U.S. at 741).

## III. Discussion

Officer Hagbom argues that judgment is warranted as a matter of law on Plaintiff's claim for false arrest, that there is no genuine dispute of fact that his use of force was objectively reasonable, and that he is otherwise entitled to qualified immunity on Plaintiff's claims as his conduct did not violate any clearly established right.

### A. Malicious Prosecution

Banas first raises a claim for malicious prosecution for Hagbom's seizure of him and his subsequent prosecution for violation of the local ordinance.

The Sixth Circuit recognizes that a malicious prosecution claim under the Fourth Amendment provides a cause of action for damages caused by "wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir.2006). The Circuit has identified the following elements to maintain such an action:

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

8

*Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir.2010) (internal citations and quotations omitted); *see also Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014).

Here, no reasonable finder of fact could find, based on the evidence presented in the light most favorable to Plaintiff, that there was a lack of probable cause for the criminal prosecution. As the Michigan Court of Appeals summarized in its opinion reinstating Plaintiff's conviction, "[Banas] knowingly or recklessly obstructed, hindered, resisted or opposed Officer Hagbom by walking away from him, struggling with him physically and refusing to submit to his authority following 20 verbal commands to stop resisting," which supplied ample probable cause for Habom's arrest of Plaintiff and the subsequent prosecution. (*People v. Banas*, ECF No. 37-2 at PageID.240.) The Court is in full agreement with the Michigan Court of Appeals' assessment.

Moreover, Banas' malicious prosecution fails because the criminal proceeding was not resolved in his favor. *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994); *See, e.g., Dixon v. Ginley*, 2013 WL 2425132, at *6 (N.D. Ohio June 3, 2013) (declining to address the other elements of malicious prosecution claim as plaintiff could not show that criminal proceedings resolved in his favor). As the Court has noted, the Michigan Court of Appeals reinstated Plaintiff's conviction, and the Michigan Supreme Court denied leave to appeal. Thus, Plaintiff cannot meet the elements of his malicious prosecution claim, so qualified immunity applies, and summary judgment is warranted.

**B. Excessive Force**

9

Plaintiff also raises a claim for excessive force. He asserts that Officer Hagbom violated his right to be free from excessive force by taking him to the ground, striking him with his knee while on the ground, and by using his taser.

Before taking up the merits of Plaintiff's claims, there remains a procedural issue. Defendant claims in his reply brief that Plaintiff failed to address the merits of his excessive force claims specific to the alleged knee strikes and use of the taser in the briefing on the motion for summary judgment. (Defendant does not contest that Plaintiff engaged in a particularized analysis of the initial takedown.) Defendant thus argues that Plaintiff has waived any claims relating to the knee strikes or tasing by failing to defend against his arguments for summary judgment on those claims. In support of his position, Defendant cites general caselaw for the proposition that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[.]" *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Upon review of Defendant's argument, the Court notes that despite spanning 38 pages, Plaintiff's brief addresses the alleged knee strikes and tasing only in broad terms while devoting significant analysis to the initial takedown. However, by the barest of margins, the Court finds that Plaintiff sufficiently addressed the latter acts to require a ruling on the merits, so the Court will turn there now.

The Fourth Amendment enshrines the people's right to freedom from unreasonable seizures. The use of force by police officers will constitute a seizure, and force that is "'objectively [un]reasonable' in light of the facts and circumstances confronting" officers violates a federal right. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts endeavor to

analyze "reasonableness at the moment" the force was used, "rather than with the 20/20 vision of hindsight." *Id.* at 396.

Therefore, the central inquiry is whether, "under the totality of the circumstances, the officer's actions were objectively reasonable." *Fox v. DeSoto*, 489 F.3d 227, 236–37 (6th Cir. 2007). In examining the use of force by an officer, the analysis is primarily guided by "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011) (quoting *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)). And finally, because each separate application of force could constitute a new constitutional violation, each action must be analyzed in turn. *See, e.g., Jackson v. Washtenaw County*, 678 F. App'x 302, 306 (6th Cir. 2017).

The Initial Takedown

The dash cam footage captures Banas resisting Officer Hagbom's attempts to bring him back to the police cruiser to await the ambulance. At this point, as the Michigan Court of Appeals put it—and the Court agrees—Banas had demonstrated that his intoxication posed "a potential threat to himself and public safety." (*People v. Banas*, ECF No. 37-2 at PageID.240.)

During this sequence, the video shows that Plaintiff disobeyed Hagbom's repeated commands to stop walking away from the scene, pulled away from Officer Hagbom, and pushed back upon him. Officer Hagbom warned Banas that if he continued to resist, that he would take Banas "to the ground." At that point, Banas lowered his center of gravity to further

11

resist Officer Hagbom's attempts to lead him back towards the cruiser, and the pair did indeed go to the ground and quickly tussled out of frame.

Courts have long distinguished active resistance by arrestees from passive resistance. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. *See ibid.*; *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). The latter is generally shown by the lack of physical resistance or verbal antagonism. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). Here, Banas' conduct clearly falls on the side of active resistance.

The distinction between active and passive resistance is an important one. "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff*, 791 F.3d at 642. In light of Banas' active resistance to Hagbom's efforts to bring him back to the police cruiser, the Court concludes that Officer Hagbom's initial use of force was objectively reasonable. *See Dunn v. Matatall,* 549 F.3d 348, 354 (6th Cir.2008) (holding that when a suspect "appeared recalcitrant in complying with the Officer's commands," the officers involved "acted reasonably in attempting to neutralize a perceived threat" by forcibly pulling him from his car and taking him to the ground).

In sum, at this stage in the encounter, any reasonable juror would conclude that the force used by Officer Hagbom was objectively reasonable, as Banas had demonstrated through his conduct that he was a potential danger to himself and others, and he actively

12

resisted Officer Hagbom's attempts to return him to the area near the police cruiser. Thus, Officer Hagbom is entitled to qualified immunity and summary judgment for Plaintiff's claim that Officer Hagbom used excessive force in taking him to the ground.

### Knee Strikes

Once Officer Hagbom took Plaintiff to the ground, much of the ensuing scuffle was not captured by the video. However, Officer Hagbom can be heard repeatedly instructing Banas to put his hands behind his back, and Banas repeatedly asking "why are you fighting me?"

According to Plaintiff, Banas was actually on top of him at this time, and Hagbom was a "240-pound behemoth," so he was "physically unable" to put his hands behind his back. In his telling, Plaintiff was subdued by Hagbom very quickly after Hagbom took him to the ground. During this sequence, Plaintiff also recalled being kneed at least three times in the ribs.

When the totality of the evidence is viewed in the light most favorable to Plaintiff, a reasonable juror could conclude that Officer Hagbom had subdued Plaintiff by landing on top of him shortly after the takedown, such that Plaintiff could not put his hands behind his back. Then, after Plaintiff failed to do so, Officer Hagbom allegedly struck Plaintiff three times by kneeing him in the ribs. Plaintiff reports that he suffered a broken rib as the consequence of Officer Hagbom's knee strikes.

"It is clearly established that officers may not use gratuitous force against subdued suspects who pose no threats to officers." *Leath v. Webb*, 323 F. Supp. 3d 882, 899 (E.D. Ky. 2018) (citing *Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 852 (6th Cir. 2016*); Baker v.*

13

*City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("[W]e have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.")).

While Officer Hagbom disputes Plaintiff's account, and the audio captured of these crucial seconds may lend some support Hagbom's version, Plaintiff's version of the events has not been "blatantly contradicted" and "utterly discredited by the record," such that "no reasonable jury could believe it." *Landis v. Phalen*, 297 F. App'x 400, 405 (6th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Factual issues therefore preclude a grant of summary judgment on this use of force.

Similarly, Officer Hagbom had "fair warning" that using gratuitous force against a subdued suspect violates clearly established constitutional law. In other words, no reasonable officer would conclude that kneeing a subdued suspect three times with sufficient force to break bones to be a justified use of force. In light of these conclusions, qualified immunity cannot bar Banas' claim specific to the knee strikes.

### Taser Deployment

Subsequent to striking Plaintiff three times with his knee, Officer Hagbom deployed a single, ten-second charge of his taser into Plaintiff's back in dry-stun mode.[2]

---

[2] Plaintiff claimed to have been tased several times, however, the Taser Information Report (ECF 37-5) conclusively establishes that Officer Hagbom's taser was activated a single time on August 30, 2014 for a duration of ten seconds.

The excessive force analysis of this conduct largely aligns with that of the alleged knee strikes. It is clearly established within this Circuit and elsewhere that where a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (collecting cases). In *Thomas v. Plummer*, 489 F. App'x 116 (6th Cir. 2012), the Sixth Circuit plainly held as follows: "The question presented is whether an officer's tasing a once-disobedient suspect who has stopped resisting constituted excessive force, as of August 23, 2009. We hold that it did." *Id.* at 126 (citing *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010).

For the reasons previously described, this case turns on a genuine issue of material fact. Plaintiff insists that after Officer Hagbom took him to the ground, he was no longer resisting, and he merely could not put his hands behind his back because Hagbom's body prevented him from doing so. If that is the case, then a jury could conclude that Banas was a "once-disobedient suspect who [had] stopped resisting arrest . . . ." In that scenario, Banas' use of the taser (in addition to the knee strikes) would be unreasonable, and would constitute a clearly established violation of Plaintiff's Fourth Amendment rights. 489 F. App'x at 126.

Therefore, Officer Hagbom's motion for summary judgment as to his use of the taser is denied, and he is not entitled to qualified immunity in light of the disputed factual issues.

### IV. Conclusion

For the reasons just explained, Defendant's motion is granted in part and denied in part. Judgment is warranted on Plaintiff's malicious prosecution claim as a matter of law. There is no genuine dispute of fact that Officer Hagbom's initial takedown was a reasonable

15

use of force, and qualified immunity applies. However, there remains a material dispute of fact as to the reasonableness of Officer Hagbom's alleged knee strikes and use of his taser. A reasonable finder of fact could conclude that, at the time this force was used, Plaintiff was a formerly-disobedient suspect who had been subdued. If that is the case, then Defendant violated Plaintiff's clearly established right to be free from excessive force. Accordingly, summary judgment is denied as to the latter claims, and the Court denies Officer Hagbom qualified immunity.

## ORDER

For the reasons explained in the accompanying opinion, Defendant Michael Hagbom's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

Date:   February 28, 2019                            /s/ Paul L. Maloney
                                                                           Paul L. Maloney
                                                                           United States District Judge